IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRINK'S INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 23 C 16727 |
| KINGSBRIDGE HOLDINGS, LLC, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In July 2015, plaintiff Brink's, Inc. entered into a "master lease agreement" with AAM Capital, Inc., the predecessor of defendant Kingsbridge Holdings, LLC (KBH), under which KBH agreed to lease safes to Brink's. The agreement provided that KBH would enter into one or more "lease schedules" with Brink's, i.e., lists of equipment that would be covered by the master lease, and that Brink's would pay KBH rent. Countercl., Ex. A ¶¶ 1-2. Under the master lease agreement, each lease schedule was "noncancelable by lessee for its entire lease term," and Brink's had an unconditional obligation to pay rent on time for the full lease term (as defined in the particular schedule).

The master lease agreement also included a provision entitled "Redelivery." *Id.* ¶ 11. It stated that not less than 30 days and not more than 270 days before the expiration of the lease term, Brink's was to provide written notice of its intent to return the equipment upon expiration of the lease term. If Brink's failed to do this, then under the agreement the lease term would be deemed automatically extended for a period

lasting until 30 days after Brink's provided the required notice. During this extended period, Brink's would be obligated to pay KBH "per diem rent at the last prevailing basic or renewal rent" under the applicable lease schedule. In this situation, the "stipulated loss value" of the equipment covered by the lease schedule "shall be deemed to be equal to the Stipulated Loss Value of the Equipment determined as of the last Payment Date during the applicable Lease Term (not taking into consideration the extension described in this Section), and the applicable percentage factor shall be the last percentage factor set forth in the Lease Schedule covering such Equipment." "Stipulated Loss Value" was a reference to the master lease's requirement for Brink's to maintain first-party insurance covering the safes for loss of damage, in an amount not greater than the full replacement cost of the safes, or their "stipulated loss value." *Id.* ¶ 9. A list of definitions attached to the master lease agreement defined "stipulated loss value" as the equipment's acquisition cost, adjusted in a manner provided in the definition.

The master lease agreement does not appear to contain any term that permitted Brink's to return safes before the end of the original term of a particular lease schedule *and* get off the hook for paying rent on all the safes for the lease schedule's full term.

In or about 2017, Brink's and KBH entered into a supplement to the master lease agreement entitled "cash handling equipment – renewal terms protocol." Countercl., Ex. B. This included a provision called the "renewal protocol," which "defines the terms that [KBH] and [Brink's] have agreed shall apply to any Renewal Agreement," a term defined to mean "a Lease Agreement entered into by [Brink's] at the end of the Base Term to retain Equipment"—i.e., at the end of a particular lease schedule.

2

The renewal protocol, a key provision at issue on the present motion, reads as follows:

> At the end of a Base Term, [Brink's] has the right, but not the obligation, to exercise the following but only if [Brink's] gives irrevocable notice to [KBH] unequivocally electing this option ('Exercise Notice') and the Exercise Notice is received by [KBH] at least 30 days but no more than 270 days before the end of the Term.
>
> If no Event of Default is continuing at the time [KBH] receives the Exercise Notice or at the end of the Term and [KBH] determines that no material adverse change in [Brink's] business or financial condition has occurred since the Acceptance, [Brink's] may renew the Base Term for a Renewal Term specified in the Exercise Notice.
>
> In relation to any such Renewal Agreement, the Renewal Rent to be paid by [Brink's] will be negotiated between [KBH] and [Brink's] based upon the following factors: the Residual Value of the Equipment; the Applicable Rate; the Retained Equipment Percentage; and the length of the renewal term selected by [Brink's]. The same methodology and assumptions originally used by [KBH] will be applied.
>
> . . .
>
> If the foregoing Renewal option or the Redelivery Option in Section 11 of the Master Lease is not exercised, the Base Term will automatically extend for successive 3-month Renewal Terms in which case [Brink's] will continue to pay [KBH] rent at the rate of the total periodic Rental Payment previously in effect for all items of Equipment and Soft Cost Items and all other provisions of the Master Lease will continue to apply. If the Renewal option is not exercised but [Brink's] returns a portion of the Equipment to [KBH] pursuant to the Redelivery Option, the Base Term will automatically extend for successive 3-month Renewal Terms in which case [Brink's] will continue to pay [KBH] rent at the rate of the total periodic Rental Payment previously in effect proportionately reduced in accordance with the Retained Equipment Percentage.
>
> . . .

*Id.* at 1-2. Each of the capitalized terms had a definition in either the renewal protocol or the master lease agreement. In particular, the term "Retained Equipment Percentage" was defined as "the Original Cost of Retained Equipment from a particular Lease Schedule expressed as a percentage of the Original Cost of all Equipment in the same

3

Lease Schedule." *Id.* at 1.

In this lawsuit, Brink's asserts that it has the right to make partial returns of equipment and need not return all items of equipment listed on a lease schedule. Brink's seeks a declaratory judgment that KBH breached the master lease by refusing to except partial returns, causing Brink's losses in excess of $475,000 to store and inspect equipment it wanted to return.

In its counterclaim against Brink's, KBH alleges that after entering into the master lease agreement, Brink's defaulted by failing to pay the full rent owed at various times. KBH further alleges that Brink's also defaulted by "return[ing] certain items of equipment to [KBH] during the initial term of the Lease Schedules or prior to expiration of the initial term. Then, after returning the equipment, Brink's unilaterally reduced its rent payments to [KBH]." Countercl. ¶ 2. KBH alleges that despite being notified of these and other defaults, Brink's attempted to invoke a provision of the Renewal Terms Protocol that allowed for partial returns at or after the expiration of a Lease Schedule's initial term. KBH alleges that this "provision could only be invoked if Brink's was *not* in default under the Lease Agreement, which Brink's, at all relevant times, was." *Id.* ¶ 4.

Brink's has moved to dismiss the counterclaim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. It says that the counterclaim is based on a misreading of the master lease agreement and the renewal terms protocol. Brink's also challenges the enforceability of a liquidated damages term contained in the mater lease agreement.

Brink's argues that "the unambiguous contractual language permits partial safe returns." Pl.'s Mot. to Dismiss at 3. Specifically, Brink's contends that it "exercise[ed]

the Redelivery Option" under the last quoted sentence of the renewal terms protocol.

To recap, that sentence reads:

> If the Renewal option is not exercised but [Brink's] returns a portion of the Equipment to [KBH] pursuant to the Redelivery Option, the Base Term will automatically extend for successive 3-month Renewal Terms in which case [Brink's] will continue to pay [KBH] rent at the rate of the total periodic Rental Payment previously in effect proportionately reduced in accordance with the Retained Equipment Percentage.

Countercl., Ex. B at 2. This sentence, Brink's argues, contemplates a partial return of equipment on a lease schedule, because it specifically references Brink's returning "a portion" of equipment on a lease schedule under the master lease agreement's redelivery option, and proportionate reduction of rental payments based on the percentage of equipment retained by Brink's. But the renewal protocol addresses what happens *at or after the end* of the base term of a lease, not *during* the base term. In the counterclaim, KBH expressly alleges that Brink's returned equipment *during* the base term of one or more lease schedules.[1] Brink's does not cite, and the Court cannot find, any provision of the master lease agreement or the renewal terms protocol that allows this. To the contrary, the master lease agreement, as noted earlier, unconditionally requires payment for all items of equipment on a lease schedule for the full base term set out in the lease schedule. For this reason, Brink's is not entitled to dismissal of the counterclaim.

The Court cannot stop here, however. KBH's response to the motion to dismiss

---

[1] *See* Countercl. ¶ 2 ("Further, despite its clear obligations under the Lease Agreement, Brink's returned certain items of equipment to [Kingsbridge] *during the initial term of the Lease Schedules or prior to expiration of the initial term.* Then, after returning the equipment, Brink's unilaterally reduced its rent payments to [Kingsbridge].") (emphasis added).

5

includes a hint that despite the clear allegation in the counterclaim—just referenced—that Brink's made partial returns and unilaterally reduced its rent payments during the lease schedules' base terms, that may not be what actually happened. Specifically, in its response, KBH states that "[i]n mid-2020, *as the first Lease Schedules reached the end of their Base Terms*, Brink's returned certain safes to [KBH], retained others, and unilaterally reduced its rent in proportion to the items it had returned." Def.'s Resp. to Pl.'s Mot. to Dismiss at 6 (emphasis added). KBH goes on to argue that Brink's was not entitled to do this under the renewal terms protocol.

For present purposes, the Court, as it must, is taking the counterclaim at face value when it says that Brink's made partial returns and unilaterally took rental payment reductions *during the base terms* of the lease schedules. As indicated earlier, if that is what Brink's did, its actions were at odds with the terms of the contract. But if what Brink's did is (and is only) what KBH suggests in the just-quoted language in its response brief, the analysis is different. Specifically, Brink's says that in making partial returns *at the end of a lease's base term* and taking partial rent reductions, it was acting pursuant to one of the options in the renewal terms protocol. The Court proceeds to address that point.

The renewal terms protocol, quoted earlier, gave Brink's different options at the end of the base term of a lease schedule. First, Brink's could—with appropriate notice—renew and renegotiate the rent based on factors set out in the renewal terms protocol. Under the renewal terms protocol, however, Brink's could elect this route only if "no Event of Default is continuing at the time [KBH] receives the Exercise Notice or at the end of the Term." But Brink's was not required to take advantage of this particular

6

renewal option: the renewal terms protocol expressly stated that Brink's "has the right, but not the obligation, to exercise" this option. <u>Second</u>, Brink's could, under paragraph 11 of the master lease agreement, exercise the "redelivery option" and send all the equipment back at the end of a lease schedule's term. <u>Finally</u>, Brink's had a third option under the renewal terms protocol, an option that by its terms applied "[i]f the foregoing Renewal option or the Redelivery Option in Section 11 of the Master Lease is not exercised": Brink's could allow an automatic extension of the lease schedules' base term for successive three-month periods, with one adjustment that the Court will discuss in the next paragraph.

The third option is the one that Brink's says it operated under when it made partial returns. *See* Pl.'s Mot. to Dismiss at 4. And it contends that under this option, it was *allowed*—again, upon or after the expiration of a lease's base term—to make partial returns. Brink's derives this from the renewal terms protocol's language regarding how the rental payments due would be determined if Brink's took this route: it would "continue to pay [KBH] rent at the rate of the total period Rental Payment in effect proportionately reduced in accordance with the Retained Equipment Percentage." Countercl., Ex. B at 2. As noted earlier, the term "Retained Equipment Percentage" is defined in the renewal terms protocol to mean the original cost of retained equipment from a particular lease schedule, expressed as a percentage of the original cost of all equipment in that same lease schedule. *Id.* at 1.

The Court agrees with Brink's that this language in the renewal terms protocol contemplates a partial return of equipment at the end of a lease's scheduled term and a corresponding reduction of rental payments on the equipment retained. So if that is

what happened here, Brink's was acting within its rights—subject to, of course, correct determination of the proportionate rent reduction. And this third option, contrary to KBH's argument, *does not require* Brink's not to have defaulted earlier: the "no default" condition applies only to the first renewal option in the renewal terms protocol, under which a rental reduction is negotiated pursuant to identified factors.

The Court notes that KBH also contends that Brink's breached the master lease agreement in other ways. *See* Def.'s Resp. to Pl.'s Mot. to Dismiss at 7 (citing Countercl. ¶¶ 49-50). The above discussion regarding partial returns does not involve these other, separate alleged breaches by Brink's.

As indicated earlier, Brink's also challenges the enforceability of the master lease agreement's liquidated damages term. The challenged term reads as follows:

> If an Event of Default occurs with respect to any Lease, Lessor (or Assignee, if applicable) may (in its sole discretion) . . . (5) demand and recover from Lessee (a) all accrued and unpaid Rent as of the date of the Event of Default, plus (b) as liquidated damages for loss of a bargain and not as a penalty, and in lieu of any further payments of Basic Rent or Renewal Rent (as applicable), the Stipulated Loss Value of the Equipment as of the date of the Event of Default (as if all of the Equipment constitute Casualty Equipment on such date and, subject to the following proviso, such date constituted the Loss Payment Date in connection therewith, provided however, that if the Event of Default does not occur on a Payment Date, the Stipulated Loss Value of the Equipment shall be prorated on a per diem basis between the Stipulated Loss Value of the equipment as of the two Payments Dates closest in time to the date of the Event of Default if the Event of Default does not occur on a Payment Date), plus (c) all Enforcement Costs incurred by or on behalf of Lessor, if any, plus (d) interest at the Default Rate on the total of the foregoing for the period from the date of the Event of Default until fully and indefeasibly paid to Lessor (collectively, "Liquidated Damages") . . . .

Countercl., Ex. A ¶ 17(a). This term entitles KBH to recover any rent that remains unpaid up to the date of the default (but not future unpaid rent), plus the "Stipulated Loss Value" of the equipment. The latter term is defined as the equipment's acquisition cost multiplied by a "percentage factor applicable to the Loss Payment Date," as set

8

forth in the lease schedule. The "Loss Payment Date," in turn, is defined as the next rental payment date immediately following a "total loss" of equipment. In rough terms, therefore, the quoted language entitles KBH to recover the rent unpaid as of the date of default *plus* what amounts to an estimate of the then-current actual value of the equipment. As KBH accurately describes this term, "[t]his is no more than what KBH would have received if Brink's paid all rent and either returned the equipment to KBH or agreed to renew the Lease Agreement"; it is *not* a windfall. Brink's has failed to establish that this runs afoul of the Illinois version of the Uniform Commercial Code, which states that damages payable for default "may be liquated in the lease agreement" if they are "reasonable in light of the then anticipated harm caused by the default or other act or omission." 810 ILCS 5/2-504(1). This case is not like *In re Montgomery Ward Holding Co.*, 326 F.3d 383 (3d Cir. 2003), or *AAR Int'l, Inc. v. Vacances Heliades, S.A.*, 202 F. Supp. 2d 788 (N.D. Ill. 2002). In those cases, the liquidated damages term entitled the lessor to recover all unpaid rent *for the entire term of the lease*, plus the equipment's casualty value. Here the recovery of the equipment's loss value (casualty value) is expressly *in lieu of* recovery of the unpaid rent through the end of the lease term.

### Conclusion

For the reasons stated above, the Court denies plaintiff's motion to dismiss defendant's counterclaim. Defendant is directed to answer the counterclaim by no later than March 11, 2025.

Date: February 18, 2025

_____
MATTHEW F. KENNELLY
United States District Judge