IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRINK'S INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 23 C 16727 |
| KINGSBRIDGE HOLDINGS, LLC, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Brink's Incorporated has sued Kingsbridge Holdings, LLC (KBH) for breach of contract.  Brink's seeks a declaratory judgment that it had the right to make partial returns of safes covered by leases from KBH and was not required to return all safes listed on a lease schedule (Count 1).  Brink's also asserts that KBH breached the parties' contract when it refused to accept partial returns of the safes as the leases ended (Count 2).  KBH, in turn, has filed a counterclaim against Brink's asserting breach of contract based on various alleged breaches (Count 1).

KBH has moved for partial summary judgment on its counterclaim—specifically on the liability of Brink's for breach of contract and the enforceability of the contract's liquidated damages provision.  Brink's has filed a cross-motion for summary judgment in its favor on all claims.

## Background

This case centers around the lease of over 4,400 safes.  In 2015, Brink's and

AAM Capital Incorporated entered into a master lease agreement. Brink's and AAM entered into two more substantially similar master lease agreements in 2016. Overall, the lease contracts included the master lease agreements and forty-one separate lease schedules that list the equipment to be rented and set forth the initial, five-year lease term for the equipment included in each lease schedule. The parties also entered into a "renewal terms protocol." AAM sold and assigned its rights and interests in the master leases and related agreements to KBH. Under the lease contracts, Brink's leased safes from KBH and then leased those safes to its commercial customers.

Several provisions in the agreements are particularly relevant to the parties' breach of contract claims. First, the master lease agreement allocated the risk of loss, stating that until a safe was returned to KBH, or purchased by Brink's, Brink's "shall bear the risk of the occurrence of a Casualty to Equipment . . . " Pl.'s Stmt. of Material Facts, Ex. 1 ¶ 10(a). The agreement provided that a Casualty would be cured in one of two ways: (1) if KBH determines the Casualty is not a Total Loss, then Brink's must promptly repair the equipment by utilizing Replacement Parts; or (2) if KBH determines the Casualty is a Total Loss, Brink's must pay KBH, on the Loss Payment Date, the required rent due as of that date plus the Stipulated Loss Value of the equipment as of that date plus all other payments then due. *Id.* ¶ 10(c). The agreement defined "Casualty" as "any loss, theft, confiscation, taking, unavailability, damage or total or partial destruction of Equipment due to an insurable loss." *Id.* ¶ 1. The lease also defined "Total Loss" as

> (a) the actual or constructive total loss of the Casualty Equipment, (b) the loss, disappearance, theft or destruction of the Casualty Equipment, or damage thereto that is uneconomical to repair or renders it unfit for normal use, or (c) the condemnation, confiscation, requisition, seizure, forfeiture or

> other taking of title to or use of the Casualty Equipment or the imposition of any Lien thereon by any governmental authority.

*Id.*

The agreement also required Brinks to "provide prompt written notice to [KBH] of any Casualty to any Equipment where the repairs or replacement costs are likely to exceed $100,000." *Id.* ¶ 10(b).

Second, the parties entered into a renewal terms protocol that reads as follows:

> At the end of a Base Term, [Brink's] has the right, but not the obligation, to exercise the following but only if [Brink's] gives irrevocable notice to [KBH] unequivocally electing this option ("Exercise Notice") and the Exercise Notice is received by [KBH] at least 30 days but no more than 270 days before the end of the Term.
>
> If no Event of Default is continuing at the time [KBH] receives the Exercise Notice or at the end of the Term and [KBH] determines that no material adverse change in [Brink's] business or financial condition has occurred since the Acceptance, [Brink's] may renew the Base Term for a Renewal Term specified in the Exercise Notice.
>
> In relation to any such Renewal Agreement, the Renewal Rent to be paid by [Brink's] will be negotiated between [KBH] and [Brink's] based upon the following factors: the Residual Value of the Equipment; the Applicable Rate; the Retained Equipment Percentage; and the length of the renewal term selected by [Brink's]. The same methodology and assumptions originally used by [KBH] will be applied.
> . . .
>
> If the foregoing Renewal option or the Redelivery Option in Section 11 of the Master Lease is not exercised, the Base Term will automatically extend for successive 3-month Renewal Terms in which case [Brink's] will continue to pay [KBH] rent at the rate of the total periodic Rental Payment previously in effect for all items of Equipment and Soft Cost Items and all other provisions of the Master Lease will continue to apply. If the Renewal option is not exercised but [Brink's] returns a portion of the Equipment to [KBH] pursuant to the Redelivery Option, the Base Term will automatically extend for successive 3-month Renewal Terms in which case [Brink's] will continue to pay [KBH] rent at the rate of the total periodic Rental Payment previously in effect proportionately reduced in accordance with the Retained Equipment Percentage.
> . . .

Pl.'s Stmt. of Material Facts, Ex. 3 at 1-2.  Each of the capitalized terms had a definition in either the renewal protocol or the master lease agreement.  In particular, the term "Retained Equipment Percentage" was defined as "the Original Cost of Retained Equipment from a particular Lease Schedule expressed as a percentage of the Original Cost of all Equipment in the same Lease Schedule." *Id.* at 1.

Finally, the master lease agreement included a liquidated damages provision that reads as follows:

> If an Event of Default occurs with respect to any Lease, Lessor (or Assignee, if applicable) may (in its sole discretion) . . . (5) demand and recover from Lessee (a) all accrued and unpaid Rent as of the date of the Event of Default, plus (b) as liquidated damages for loss of a bargain and not as a penalty, and in lieu of any further payments of Basic Rent or Renewal Rent (as applicable), the Stipulated Loss Value of the Equipment as of the date of the Event of Default (as if all of the Equipment constitute Casualty Equipment on such date and, subject to the following proviso, such date constituted the Loss Payment Date in connection therewith, provided however, that if the Event of Default does not occur on a Payment Date, the Stipulated Loss Value of the Equipment shall be prorated on a per diem basis between the Stipulated Loss Value of the equipment as of the two Payments Dates closest in time to the date of the Event of Default if the Event of Default does not occur on a Payment Date), plus (c) all Enforcement Costs incurred by or on behalf of Lessor, if any, plus (d) interest at the Default Rate on the total of the foregoing for the period from the date of the Event of Default until fully and indefeasibly paid to Lessor (collectively, "Liquidated Damages") . . . .

Pl.'s Stmt. of Material Facts, Ex. 1 ¶ 17.

The parties did not encounter any issues with their agreements until July 2020 when the lease schedules began to expire.  At that time, Brink's began returning some, but not all, of the safes that were subject to the expiring lease schedules and reduced its rent payments to KBH based on the proportion of safes returned.  KBH objected to the right of Brink's to make these partial returns but accepted the returns from July 2020 until August 2021.

4

KBH typically issued invoices for Casualty that Brink's had identified for leased safes. In 2020 and 2021, Brink's did not pay KBH for the damage to numerous leased safes. The parties dispute whether the invoices for the damage adequately identified the safes that each invoice covered. Brink's asserts that it paid the total amount due for this Casualty on July 10, 2025, after KBH filed exhibits in this case that allowed Brink's to adequately identify the safes at issue.

On March 26, 2021, KBH sent Brink's an invoice for the Casualty it asserted a third-party vendor, Burroughs, identified after Burroughs assessed the condition of the safes Brink's returned from July 2020 until August 2021. The parties refer to this as the "chargebacks invoice." KBH and Brink's dispute whether this invoice included sufficient documentation to explain and justify the charges. Brink's also asserts that KBH never made the repairs listed on the invoice.

On September 3, 2021, KBH sent Brink's a letter stating that Brink's was in default of the master lease because it reduced its monthly rent payments following partial returns, disputed the chargeback invoice, and did not execute casualty amendments. KBH also notified Brink's that it would no longer accept partial returns of safes. Brink's continued to notify KBH of its intent to return safes, but KBH did not accept any returns after September 3, 2021. Brink's began placing the safes it attempted to return in storage in anticipation of an eventual return to KBH. Brink's reduced its monthly rent payments based on the number of safes it returned or attempted to return. Brink's also continued to lease a portion of the safes to its customers, subject to the agreement. KBH continued to accept partial rent payments. Sometime in mid-2022, KBH sold the returned safes for approximately $100,000.

On December 13, 2023, Brink's filed the present action against KBH. Brink's seeks a declaratory judgment that it had the right to make partial returns of safes (Count 1) and asserts breach of contract based on KBH's refusal of partial returns (Count 2). On December 9, 2024, KBH filed an amended counterclaim asserting breach of contract. Brink's moved to dismiss KBH's counterclaim. On February 18, 2025, the Court denied that motion. *Brink's Inc. v. Kingsbridge Holdings, LLC*, No. 23 C 16727, 2025 WL 524171, at *1 (N.D. Ill. Feb. 18, 2025).

KBH has now moved for partial summary judgment on its counterclaim, specifically on the issues of liability for breach of contract and the enforceability of the liquidated damages provision. Brink's has cross-moved for summary judgment in its favor on all claims.

## Discussion

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when, after drawing all reasonable inferences from the record in favor of the nonmoving party, a reasonable trier of fact could return a verdict for the nonmovant. *Id.*

The party seeking summary judgment bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the party that bears the ultimate burden at trial must identify "specific, admissible evidence showing that there is a genuine

6

dispute of material fact for trial." *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). If the party with the burden of proof cannot show that its claim or defense is factually supported, summary judgment against that party is appropriate. *Celotex*, 477 U.S. at 323–24.

The Court will begin by addressing Brinks' declaratory judgment claim before moving to the parties' respective claims for breach of contract. The Court will conclude by addressing damages.

**A.     Declaratory judgment**

The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Brink's seeks a declaratory judgment that, under the master lease and all related agreements, Brink's may make partial returns of equipment without the need to return all items of equipment subject to that lease term.

As an initial matter, the parties agree that Illinois law applies in this case, and there is no reason for the Court to conclude otherwise. Therefore, the Court will apply Illinois law. "In construing a contract, the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 46 (2011). "A court will first look to the language of the contract itself to determine the parties' intent." *Id.* "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." Id

Brink's argues that the unambiguous language in the master lease and all related agreements allows it to return only a portion of the safes subject to a lease schedule at

the end of that particular lease term. KBH disagrees. The Court previously addressed this issue in its decision on Brinks' motion to dismiss KBH's counterclaim. *See Brink's Inc. v. Kingsbridge Holdings, LLC*, No. 23 C 16727, 2025 WL 524171, at *3-4 (N.D. Ill. Feb. 18, 2025).

The renewal terms protocol gave Brink's three options at the end of the base term of a lease schedule. First, Brink's could—with appropriate notice—renew and renegotiate the rent based on factors set out in the renewal terms protocol. But Brink's was not required to take advantage of this particular renewal option: the renewal terms protocol expressly stated that Brink's "has the right, but not the obligation, to exercise" this option. Pl.'s Stmt. of Material Facts, Ex. 3 at 1. Second, Brink's could, under paragraph 11 of the master lease agreement, exercise the "redelivery option" and send all the equipment back at the end of a lease schedule's term. *Id.* at 2. Finally, Brink's had a third option under the renewal terms protocol: it could allow an automatic extension of the lease schedules' base term for successive three-month periods. This option by its terms applied "[i]f the foregoing Renewal option or the Redelivery Option in Section 11 of the Master Lease is not exercised." *Id.* The third option expressly contemplates a partial return of equipment at the end of a lease's scheduled term and a corresponding reduction of rental payments on the equipment retained: it states that "[i]f the Renewal option is not exercised but Lessee returns *a portion of* the Equipment," then the base rental term extends and Brink's continues to pay rent at the contract rate, "proportionally reduced in accordance with the Retained Equipment Percentage." *Id*. (emphasis added).

KBH urges the Court to reconsider its interpretation of the renewal terms protocol

8

and find that language ambiguous.  KBH acknowledges, however, that the contract expressly refers to Brink's "return[ing] *a portion of* the Equipment."  *Id*.  (emphasis added).  Faced with this clear contract language, KBH argues that the remainder of this sentence supports its position:  "the Base Term will automatically extend for successive 3-month Renewal Terms . . . "  *Id.*  "Renewal Term" is defined to mean "the period following the expiry of the Base Term for which Lessee will contract with Lessor under a Renewal Agreement to rent retained Equipment.*"  Id.*  According to KBH, these "interlocking definitions" mean "that there is a requirement for there to be a 'Renewal Agreement' in place *before* Brink's can take advantage of the language on which it relies."  Def.'s Reply at 7.

      KBH's argument is unpersuasive; it ignores the express language of the contract.  The contract stated that the base term will "*automatically extend* for successive 3-month Renewal Terms . . . "  Pl.'s Stmt. of Material Facts, Ex. 3 at 2 (emphasis added).  This automatic extension of the renewal terms expressly precludes any requirement for a preexisting, separate renewal agreement.  If the parties intended to require this, the contract would not provide for an automatic extension.  The Court finds no reason to abandon its previous interpretation of the renewal terms protocol.

      In sum, Brink's is correct that the contract allowed partial returns of safes at the end of a lease term.  The contract also provided that the rental payments Brink's made to KBH would be reduced proportionally based on the number of safes that Brink's returned to KBH.  Brink's is thus entitled to summary judgment in its favor on its declaratory judgment claim, Count 1.

**B.     Breach of contract**

Brink's and KBH each allege that the other party has breached the master lease agreement.  To succeed on a breach of contract claim, a plaintiff must prove the following elements:  (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach.  *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 28, 215 N.E.3d 871, 877.  Neither party contests that a valid and enforceable contract existed.

    **1.     Breach by KBH**

Brink's contends it is entitled to summary judgment on its claim that KBH breached the contract when it refused to accept partial returns of safes at the end of a particular lease term.  KBH responds that Brink's did not "attempt to prove that *each* Partial Return that it made over the subsequent years involved a safe that was on a Lease Schedule past the end of its respective Base Term."  Def.'s Resp. at 6.  But the record undercuts KBH's argument.

Brink's provided KBH notice of each partial return of safes.  A review of these records shows that Brink's provided notice that it intended to return safes only at the end of their lease terms.  *See* Pl.'s Stmt. of Material Facts, Ex. 5.  KBH does not cite any evidence to the contrary.  Because the contract allowed Brink's to make partial returns of the safes when a lease term ended, KBH breached the contract when it refused to accept partial returns from Brink's at the end of a lease term.  No reasonable factfinder could find otherwise.

### 2. Breach by Brink's

#### a. Substantial performance

Brink's contends that KBH cannot prevail on its breach of contract claim because it did not substantially perform under the contract. KBH responds that this argument is foreclosed by the partial breach doctrine.

A party has substantially performed its part of the contract when it has performed all of the essential elements necessary to accomplish the purpose of the contract. *W.E. Erickson Const., Inc. v. Cong.-Kenilworth Corp.*, 115 Ill. 2d 119, 126, 503 N.E.2d 233, 236-37 (1986). If a plaintiff has substantially performed but subsequently breaches the contract, then an injured party may choose to continue to perform under the agreement or end the contract. *PML Dev. LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 52, 226 N.E.3d 1163, 1175-76. The decision to continue to perform indicates the injured party's intention to continue the contract, and in that situation the injured party retains all obligations of the contract. *Id.* That is, the decision to continue to perform "converts the [other party's] material breach to a 'partial' breach." *Id.*

The purpose of the contract involved Brink's leasing safes from AAM / KBH for five-year terms. It is undisputed that, for the initial term of five years, KBH provided Brink's the safes as required in the lease agreements. KBH's subsequent failure to accept partial returns of the safes is a question of breach, not non-performance. *PML Dev. LLC*, 2023 IL 128770, ¶ 52, 226 N.E.3d at 1175-76. Thus there is no genuine dispute that KBH substantially performed its part of the contract.

#### b. Breach

KBH argues that "Brink's defaults are myriad" but focuses on three: (1) Brink's

11

has not paid rent or Casualty for the safes that it placed in storage after KBH refused to accept partial returns of the equipment; (2) Brink's failed to pay more than $137,000 in Casualty dating back to 2020; and (3) Brink's willfully and intentionally stopped reporting Casualty to KBH in violation of the Master Lease in March 2023 (or November 2022).[1] KBH did not move for summary judgment on any alleged breach associated with the chargebacks invoice because, it says, that issue is replete with genuine disputes of material fact.

    First, KBH argues that it has not received the monthly rent to which it was entitled to for the safes Brink's returned. As discussed, the agreements expressly contemplated Brink's making these partial returns and that its rental payments would be reduced proportionately. Brink's therefore did not breach the parties' agreements by making, or attempting to make, partial returns of safes to KBH at the end of a lease term. No reasonable factfinder could find otherwise.

    Second, KBH argues that Brink's breached the contract because it was invoiced for, but failed to pay, more than $137,000 in Casualty dating back to 2020. KBH argues that in 2020 and 2021, it sent Brink's numerous invoices for payment due as the result of damage to safes. KBH asserts that the invoices were not paid, either in full or in part. Brink's concedes that it had not paid this Casualty but contends that it lacked any record of receiving the relevant invoices. Brink's asserts it remitted payment to KBH on the outstanding invoices on July 10, 2025. These are genuinely disputed facts that preclude summary judgment.

---

[1] Any arguments regarding Brinks' alleged breaches that were not made in KBH's motion and opening brief have been waived or forfeited.

12

Third, KBH argues that Brink's breached the contract when it willfully and intentionally stopped reporting Casualty to KBH in violation of the agreement. Brink's responds that it was not obligated to notify KBH of every Casualty. Brink's is correct. The agreement requires Brink's to notify KBH of "any Casualty to any Equipment where the repairs or replacement costs are likely to exceed $100,000." " Pl.'s Stmt. of Material Facts, Ex. 1 ¶ 10(b). The problem for Brink's, however, is that it does not know if any Casualty exceeded $100,000 because, at some point (the date is disputed), it stopped inspecting the safes. KBH cites testimony from a Brink's employee that there is some amount of Casualty due from the safes that are in storage. Brink's has various concerns with the veracity of this testimony. These concerns, however, do not permit the Court to cast the testimony aside. Instead, these disputes create a genuine factual dispute over whether Brink's breached the contract by failing to report Casualty for safes that were kept in storage.

Brink's contends that KBH cannot succeed on its breach of contract claim because it "created its own lack of visibility" when it refused to accept the partial returns and that KBH cannot now demand compensation for an injury that is tied back to its own breach. Pl.'s Mem. at 15. But the obligation Brinks' had to continue inspecting the safes for Casualty and paying KBH for Casualty was not excused by KBH's earlier breach of the contract. *PML Dev. LLC*, 2023 IL 128770, ¶ 52, 226 N.E.3d at 1175-76 quoting *Dustman v. Advocate Aurora Health, Inc.*, 2021 IL App (4th) 210157, ¶ 38, 192 N.E.3d 47, 57 (explaining that an "'injured party may sue for any damages caused by the partial breach, but having elected to keep the contract in force, the injured party must continue to perform the contract on pain of likewise incurring liability for a

13

breach.'"). Brink's admits that it stopped inspecting the safes at some point after KBH began to refuse to accept the returns. As KBH correctly argues, without inspecting the safes Brink's cannot know how many have sustained Casualty in excess of $100,000.

A reasonable factfinder could conclude from this evidence that Brink's breached the contract when by not paying Casualty or reporting Casualty that exceeded $100,000. On the other hand, a reasonable factfinder could conclude that Brink's did not breach the contract because it did not have adequate notice of the Casualty due to KBH or there was no Casualty in excess of $100,000 that Brink's should have reported but did not. These factual disputes preclude summary judgment in KBH's favor on its counterclaim.

**C.     Damages**

    **1.     Storage fees**

Brink's argues that the Court should enter summary judgment in its favor on its breach of contract claim for $1,243,362.76 plus prejudgment interest. Brink's contends that it incurred these unnecessary storage fees as the result of KBH's breach. KBH responds that there are safes in storage that are actually unreported total losses and, as such, Brink's should have paid KBH the Stipulated Loss Value, and then title would have passed to Brink's. As a result, KBH says, it should not pay for the storage of the safes that Brink's owns.

Brink's counters that KBH's argument is based on speculation. Specifically, Brink's argues that KBH cannot "ground its speculation in" testimony from Brink's Vice President of Finance, Jeff Herbert. Mr. Herbert testified that there is some amount of exposure that Brink's will owe to KBH for damage to the safes that are in storage.. Pl.'s

Reply at 5. Brink's maintains that the form of the question posed to Mr. Herbert was improper because it was compound and confusing, vague and unclear, and called for speculation. Brink's challenges attack the veracity of this testimony. But how much weight to give this testimony, if any, is an issue for the factfinder.

### 2. Liquidated damages

KBH argues that it is entitled to liquidated damages owed as of an unknown event of default, less rent paid by Brink's since that date, because that the master lease does not require that KBH invoke the liquidated damages provision immediately upon the occurrence of a default.[2] Brink's responds that the contract does not contemplate retroactively invoking the liquidated damages provision years after an alleged breach because there is no mechanism to address rent already paid. Brink's also argues that KBH's decision to invoke the liquidated damages provision at this point constitutes an inconsistent remedy.

Illinois courts generally find a liquidated damages provision to be valid and enforceable when: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained, and (3) actual damages would be uncertain in amount and difficult to prove." *GK Dev., Inc. v. Iowa Malls Fin. Corp.*, 2013 IL App (1st) 112802, ¶ 49, 3 N.E.3d 804, 816. "The purpose of damages is to place the nonbreaching party in a position that he or she would have been in had the contract been performed, not to provide the nonbreaching party with a windfall recovery." *Jones v. Hryn Dev., Inc.*, 334

---

[2] KBH argues that the amount of damages should be left to the factfinder.

15

Ill. App. 3d 413, 418, 778 N.E. 2d 245 (2002). Thus "a liquidated damages clause that operates as a penalty for nonperformance or as a threat to secure performance will not be enforced." *Jameson Realty Grp. v. Kostiner*, 351 Ill. App. 3d 416, 423, 813 N.E.2d 1124, 1130 (2004).

The liquidated damages provision entitles KBH to recover any rent that remains unpaid as of the date of the default, plus the "Stipulated Loss Value" of the equipment. "Stipulated Loss Value" is defined as the equipment's acquisition cost multiplied by a "percentage factor applicable to the Loss Payment Date," as set forth in the lease schedule. The "Loss Payment Date," in turn, is defined as the next rental payment date immediately following a "total loss" of equipment. The quoted language therefore entitles KBH to recover the rent unpaid as of the date of default plus what amounts to an estimate of the then-current actual value of the equipment. Applied prospectively, the provision is not a windfall. The recovery of the equipment's loss value (casualty value) is expressly in lieu of recovery of the unpaid rent through the end of the lease term.

Brink's relies on *Penske Truck Leasing Co. v. Chemetco, Inc.*, 311 Ill. App. 3d 447, 457, 725 N.E.2d 13, 21 (2000). In *Penske Truck*, the contract at issue included two alternative options for calculating liquidated damages, one that applied if the plaintiff decided to sell the vehicles and another that applied if the plaintiff retained the vehicles. *Id.* The plaintiff initially decided to retain the vehicles but ultimately sold all of them. *Id.* The appellate court found that the award entered by the trial court was well in excess of the actual damages suffered by the plaintiff because the court used the calculation that allowed the plaintiff to recover damages based on the method that applied if the plaintiff

16

retained the vehicles, even though the plaintiff sold the vehicles. *Id.* Brink's argues that the second option in *Penske Trucks* ensured that the liquidated damages provision would not result in a windfall but that no similar provision exists in the contract at issue in this case. KBH argues that *Penske Truck* demonstrates that a court has the authority to craft a remedy to avoid a windfall, even if that remedy is not strictly laid out in the agreement.

To avoid a windfall, KBH argues that it seeks only the liquidated damages owed from the date of default minus all rent paid by Brink's since that date. But the master lease agreement states that liquidated damages would be owed "in lieu of any *further* payments of Basic Rent or Renewal Rent." Pl.'s Stmt. of Material Facts, Ex. 1 ¶ 17 (emphasis added). KBH asks the Court to rewrite this provision to subtract the rent payments Brink's made under the terms of the lease. But the Court must enforce the contract as written. *Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 46.

Brink's also argues that KBH's retroactive invocation of liquidated damages is inconsistent with its refusal of partial returns. KBH responds that its election of the liquidated damages remedy is proper because it is suing over Brinks' failure to make Casualty payments, which is distinct from the breach of the lease based on making partial returns. KBH also argues that Brink's concealed its default by failing to disclose Casualties for years. Finally, KBH argues that, even if it had elected not to pursue liquidated damages, Brink's cannot show that it relied to its detriment on KBH's decision. KBH's argument is unpersuasive. KBH cannot now attempt to collect liquidated damages for safes that it wrongfully refused to accept. If KBH had invoked the liquidated damages provision in a timely manner, Brink's could have sold the safes it

attempted to return rather than pay for them to remain in storage. If the Court now allowed KBH to invoke the liquidated damages provision retrospectively for equipment Brink's attempted to return, the damages would be so unreasonable that the liquidated damages provision would operate as a penalty. This would be improper. *Penske Truck Leasing Co., L.P.*, 311 Ill. App. 3d 447, 457, 725 N.E.2d 13, 21 (2000).

In sum, the liquidated damages provision is enforceable only to the extent KBH seeks to invoke it prospectively for any safes that remain in Brinks' possession.[3] KBH recognizes that the proper calculation of liquidated damages, if any, is an issue for trial.[4]

### 3. Chargebacks invoice

KBH's vendor, Burroughs, inspected the partial return of safes that KBH initially accepted and identified any damage. KBH says it issued Brink's an invoice for $624,767 for this damage. The parties refer to this as the "chargeback invoice." The master lease agreement requires

> Equipment to be in the same condition as when delivered to Lessee under the related Lease Schedule, ordinary wear and tear excepted and otherwise in the condition (and to comply with) the terms of the Subject Lease. Lessee shall be responsible for the cost of all repairs, alterations, inspections, appraisals, storage charges, insurance costs, demonstration costs and other related costs necessary to cause such Equipment to be in full compliance with the terms of the subject Lease.

Pl.'s Stmt. of Material Facts, Ex. 1 ¶ 11(b).

Brink's argues that KBH has no evidence to support the chargebacks invoice because it sold the safes without making repairs and did so despite Brinks' request to

---

[3] It is unclear from the record how many, if any, safes remain in Brinks' possession.

[4] Brink's argues that, even if KBH is entitled to liquidated damages, it is not entitled to recover attorneys' fees before it added that claim on December 9, 2024. This request is premature.

18

inspect the safes. Brink's also argues that the chargeback amount has been "grossly inflated." Pl.'s Mem. at 24. KBH, however, has cited testimony that Burroughs employed qualified and trained technicians who prepared detailed reports of their evaluations noting the condition of each returned safe and identifying the costs to fully repair each one. Brink's recognizes that KBH also presented reports and a spreadsheet from its vendor Burroughs asserting the safes were damaged. Still, Brink's argues that these reports do not provide a reasonable basis to establish damages with a reasonable degree of certainty. The Court concludes that this presents a factual dispute that must be resolved by the factfinder.

4. **Back rent**

Finally, Brink's argues that it is entitled to summary judgment in its favor on KBH's claim for damages equal to the "unilateral reduction in rents based on improper partial returns of equipment", or "back rent." Pl.'s Mem. at 24. KBH does not directly address this argument. Based on the Court's holding that Brink's did not breach the contract by making partial returns at the end of the relevant lease term, no reasonable factfinder could find Brink's liable for rent associated with those partial returns. The Court thus grants Brinks' motion for summary judgment on the issue of back rent.

**Conclusion**

For the reasons stated above, the Court denies KBH's motion for summary judgment [dkt. no. 79]. The Court grants Brinks' motion for summary judgment [dkt. no. 106] on its declaratory judgment claim (Count 1), KBH's liability for breach of contract (Count 2), and KBH's claim for back rent. The Court otherwise denies Brinks' motion. A telephonic status hearing is set for October 24, 2025 at 9:00 a.m., using call-in number

19

650-479-3207, access code 2305-915-8729.  The parties should be prepared to discuss the anticipated length of the trial on the remaining issues and set a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  October 21, 2025